Commonwealth *v.* Flynn, Appellant.
Commonwealth *v.* McGee, Appellant.

Argued September 25, 1939.

Before KELLER, P. J. CUNNINGHAM, BALDRIGE, STADTFELD, PARKER, RHODES and HIRT, JJ.

*Robert C. Duffy,* with him *Henry Thomas Dolan,* for appellant, in Nos. 243, 340, 341 and 342.

*Milton Romm,* for appellant, in No. 222.

*Thomas I. Guerin,* with him *Bryan A. Hermes,* Deputy Attorneys General, *Claude T. Reno,* Attorney General, *James N. Lafferty* and *Gilliat G. Schroeder, Jr.,* Assistant Deputy Attorneys General, for appellee.

OPINION BY CUNNINGHAM, J., November 17, 1939:

Joseph McGee and Bernard J. Flynn, the lessee and operator of a licensed taproom at No. 4010 Market Street, Philadelphia, were jointly charged under indictments, identical in form, except as to dates, with book-making and permitting premises occupied by them to be used for the purpose of receiving, registering and forwarding bets and wagers upon the results of horse races at certain specified racecourses, in violation of the Act of May 22, 1895, P. L. 99, 18 PS §1461.

The proceedings below resulted in the conviction of McGee of a violation of the statute on March 17, 1938, and of Flynn for violations on June 30, 1937, and March 4, 15 and 17, 1938. McGee was sentenced to imprisonment for three months and Flynn to concurrent terms of three months each, after their motions for new trials had been denied. No question is raised by counsel for either appellant as to the sufficiency of the Commonwealth's evidence, if believed by the jury, to sustain the verdicts.

In behalf of Flynn, who did not take the stand but called a number of character witnesses, two assignments of error have been filed. By the first it is asserted the deputy attorney general in charge of the prosecution was permitted to ask improper questions while cross-examining Charles F. Dudley, who had testified to the good reputation of Flynn as a peaceful, law-abiding citizen. The portion of the cross-examination here in question reads: "Q. Now, did you know Mr. Flynn when he ran the Bar X Dude Ranch out in Delaware County? A. No, sir, I didn't. Q. Did you know that that liquor license was revoked out there for sales on Sunday? A. No, sir. Q. Did you ever hear of that? A. No, sir. Q. All right." These questions were not objected to when asked nor was any motion made to strike out the testimony. After the questions had been asked and answered counsel for Flynn said, "I am going to ask Mr. Guerin (the deputy attorney general) to pro-

duce the fact that Mr. Flynn has ever owned the Bar X Dude Ranch himself. He has asked that question and unless he produces it I am going to object to that question."

In their brief, counsel for Flynn argue that the purpose of the representative of the Commonwealth was to prove a specific previous instance of criminal misconduct. This testimony should be read in connection with a portion of the cross-examination of Thomas J. O'Neill, another character witness for Flynn, who was cross-examined as follows, without any objection by counsel for Flynn: "Q. Did you know him (Flynn) when he had the Bar X Dude Ranch out in Delaware County? A. No, sir, I did not. Q. Did you ever hear that he had the Bar X Dude Ranch in Delaware County? A. No, sir, I did not. Q. Did you ever hear that the license of the Bar X Dude Ranch in Delaware County was revoked for the sale of liquor on Sunday? A. Nothing at all, sir. Q. You never heard anything about that? A. Never did, sir. Q. That is all."

As this is the only assignment in behalf of Flynn justifying detailed examination, we will dispose of it upon its merits but are not to be understood as holding that the question discussed in the briefs was properly raised upon this record. It is well established that neither the possession of a good reputation nor the lack of it can be shown by proof of specific acts. The test is whether the purpose of the cross-examination was to show the extent of the knowledge of the witness with respect to the reputation of the defendant, or, on the other hand, to rebut the testimony of good reputation by showing the defendant had committed another distinct crime. The question was fully considered by our Supreme Court in *Com. v. Becker,* 326 Pa. 105, at page 114, 191 A. 351. After citing *Com. v. Jones,* 280 Pa. 368, at page 370, 124 A. 486, Mr. Justice DREW, in the course of his opinion in the Becker case, said: "The proper function of cross-examination in such a situa-

tion, the witness having qualified, is not to affirmatively establish the fact of bad reputation, but to break down the basis of the testimony of the witness as to good reputation. A distinction is drawn between cases where it is sought to prove particular acts of misconduct and those where the purpose of the examination is to test the accuracy of the testimony by showing either that the witness is not familiar with the reputation concerning which he has testified or that his standard of what constitutes good repute is unsound. An overwhelming majority of jurisdictions, including our own, recognize such a distinction: *Commonwealth v. Thomas,* 282 Pa. 20; *Commonwealth v. Jones,* supra; *State v. Rowell,* 172 Ia. 208; *Regina v. Wood,* 5 Jur. 225; Wigmore on Evidence (2d ed. 1923) section 988; 71 A. L. R. 1505. The admission of testimony of good reputation is of doubtful value and often deceptive where there is not applied to it the acid test of cross-examination to prove the accuracy of the testimony and the standard by which the witness measures reputation: see *People v. Laudiero,* 192 N. Y. 304. This rule does not permit of the introduction of substantive evidence of the accused's previous conduct. Such testimony is admissible only to discredit the character witness. Where the record discloses that the actual purpose of such cross-examination was to show that defendant had committed a specific crime of which he is not now accused, and not to test the credibility of the character witness, it will be held improper if it tends to prejudice the accused. The problem in each case is to determine whether the inquiry at cross-examination is directed to the witnesses' hearing of the rumor, or is directed toward the substantive fact of the defendant's misconduct."

Although Dudley was asked whether he *knew* that Flynn's license in Delaware County had been revoked, we think it apparent, in the light of Daley's cross-examination, that the real purpose of the representative of the Commonwealth was to ascertain the extent of the

knowledge of the witnesses with relation to the reputation of defendant, rather than to elicit substantive evidence of previous misconduct. It is to be noted that in Daley's cross-examination all of the inquiries were whether he had *heard* that Flynn operated the ranch and that the license had been revoked. Although the question to Dudley, "Did you *know* that that liquor license was revoked out there for sales on Sunday?" was on the border line, we think the real purpose of the cross-examination was to ascertain the extent of each witness's knowledge of the subject concerning which he undertook to testify.

The other assignment in behalf of Flynn relates to the refusal of the motion of his counsel for the withdrawal of a juror by reason of an alleged improper remark by the deputy attorney general in his final argument to the jury.

In their examination of the first witness called to prove Flynn's previous good reputation his counsel were careful to show that the witness, John C. Palmer, had known, and transacted business with, Flynn "during that period of his life when he had a seat on the Philadelphia Stock Exchange." The challenged remark was: "Reference has been made to Flynn's being a member of the Philadelphia Stock Exchange. Well, that doesn't mean anything. Whitney was the President of the New York Stock Exchange."

The ground upon which the trial judge denied the motion appears from the following colloquy: "The Court: I will refuse the motion because you went out of your way to inform the jury that the defendant, Flynn, had been a member of the Philadelphia Stock Exchange. Mr. Duffy: (Counsel for Flynn) Yes, sir. That is part of his good reputation and character. The Court: It is, but counsel has a right to answer that, which he has **done**."

It might have been better taste for the deputy attorney general to have refrained from his specific

reference to a case of recent newspaper notoriety, but we are not persuaded that the trial judge, acquainted as he was with the entire atmosphere of the case at bar, abused the discretion vested in him when he refused to withdraw a juror: *Com. v. Davison*, 99 Pa. Superior Ct. 412, 416, and cases there cited. See also *Com. v. Wilcox*, 112 Pa. Superior Ct. 240, 170 A. 455, and *Com. v. Lynott*, 133 Pa. Superior Ct. 565, 3 A. 2d 207.

The assignments filed by counsel for Flynn are overruled.

On behalf of McGee three assignments of error have been filed. Each is based upon an excerpt from the charge of the trial judge, OLIVER, P. J. McGee took the stand and positively denied any participation in any gambling operations which may have been carried on in Flynn's taproom. In addition, he endeavored to show by several witnesses that he was not there on the afternoon of March 17, 1938, the date to which the testimony of the Commonwealth as to the commission by him of any offense was confined. The jury does not seem to have been impressed with McGee's denial or with his effort to prove an alibi. The testimony which the jury evidently accepted as true was given by George Voron, an investigating officer of the Pennsylvania Liquor Control Board, who stated he entered the premises at 2:30 in the afternoon of March 17, 1938. An excerpt from his testimony reads: "Q. Just what happened on March 17th? Tell us what conversations you had with Mr. McGee after you went in there. A. Mr. McGee rose from a table and went to answer the phone and after he had finished speaking on the phone, I approached him and I gave him a dollar to bet on a horse called 'Boston Pal' which was running at Tropical Park. He took my bet and marked it on a scratch pad. Q. Did you see anybody else make any bets on this occasion? A. Yes, I did. Quite a few bets were made. Q. Did you see any money being received by Mr. McGee

for bets? A. It was, yes, sir. Q. Did you see any bet being paid off by Mr. McGee? A. Not on that date. Q. On any other date? A. There was money being passed back and forth. I don't know whether he was giving change or paying off bets." There was evidence to the effect that Voron did not learn McGee's name until shortly before the arrest of the latter, but his identification of McGee as the person who took and recorded his bet on March 17th was clear and positive.

McGee's first assignment of error is based upon the following sentence from the charge: "As has been pointed out to you [by the deputy attorney general], when a man is engaged in an illegal activity, he probably isn't handing out his name broadcast." This remark was made while the trial judge was referring to the above mentioned testimony. In immediate connection therewith he remarked: "The officer said he recognized this man but there was no testimony that he knew [McGee's] name." At the conclusion of the charge, and in the presence of the jury, counsel for McGee said: "If the court please, I object to that part of your Honor's charge where you have used the argument of Mr. Guerin, that in your opinion people in that line of business do not give out their names. There was no such testimony from the witness stand, and it was purely an argument." To this the trial judge replied: "Did I say in my opinion? If I said it was my opinion that people in that line of business do not give out their names, I had no right to say that. I leave that to you. You may draw an inference if you wish as to whether people engaged in that line of business would or would not give out their names."

We think this action of the trial judge was entirely fair to McGee and indicated that the jurors were to draw their own inferences from the evidence. In the opening sentences of the charge the jury was told by the trial judge that he would instruct them upon the law but the "determination of the facts, and the drawing

of such inferences as [they thought] should be drawn from the facts," were matters for their consideration.

The second assignment is based upon two paragraphs from the charge reading:

"You heard his (McGee's) testimony as to his means of income. I could not follow it exactly, but perhaps you could,—how he had been making a living. He told you various things he had done, but you remember how definite that testimony was, or how indefinite it was, and then contrast that with the fact that he admitted he had bought a DeSoto car for which he paid eight or nine hundred dollars."

\* \* \* \* \* \*

"Counsel for McGee has referred to him as a boy, making half a dozen references to 'this boy.' Well, look at him and judge whether you think he is a boy or a man. That does not make any difference, but does he not appear to you to be more than a boy?"

The testimony indicated McGee was about thirty-five years of age, and the references to his explanation of his means of livelihood and to the fact that he was the owner of an automobile were fully justified by the evidence. Moreover, no specific exception was taken to these portions of the charge.

Counsel for McGee predicate their third assignment upon the refusal of the trial judge to withdraw a juror by reason of the remark of the deputy attorney general which we have considered and disposed of in connection with our discussion of the second assignment in behalf of Flynn. Our consideration of the entire record has led us to the conclusion that no reversible error was committed in the trial of appellants.

The judgments are severally affirmed and it is ordered that each appellant appear in the court below at such time as he may be there called and that he be by that court committed until he has complied with his sentence, or any part of it which had not been performed at the time his appeal was made a supersedeas.