## Commonwealth v. Jackson et al.

*James W. Reynolds* and *Martin H. Lock*, for Commonwealth.

*Thomas H. Lane* and *C. Russell Welsh, Jr.*, for defendants.

NEELY, J., January 22, 1952.—Defendants were tried on three separate indictments charging them

with rape. The cases were consolidated at the trial and they were all convicted by a jury. The matter is before us on the motions of these defendants for a new trial and in arrest of judgment. In the motion for new trial it is alleged, inter alia, that the verdict is against the evidence and is against the law. And in the motion in arrest of judgment it is contended that the court erred in overruling defendants' motion for a directed verdict at the close of the Commonwealth's testimony, and "in failing to find the defendants not guilty." These contentions of defendants raise the question as to the sufficiency of the evidence to sustain these convictions. And in order that this case may be understood, we deem it essential to consider the testimony in certain important aspects as it bears upon the guilt or innocence of these defendants.

The victim in this case was Betty Jane Sutton, a girl 18 years of age, who had graduated from high school in June of 1951. She was short in stature and weighed 105 pounds at the time of the occurrence involved in this case. Defendants were soldiers stationed at the Indiantown Gap Military Reservation. One of them weighed 170 pounds and was 5 feet, 11 inches in height. All of them were robust young men. On the night of July 30, 1951, Miss Sutton had been taken by her mother to a playground near Twenty-ninth Street in the Borough of Penbrook prior to 8 p.m. She was dressed in a blouse, shorts, saddle shoes, socks and underclothing. She left the playground at about 10:30 p.m., and then visited for an hour with friends at their residence situated at Twenty-ninth and Walnut Streets in Penbrook.

At about 11:30 p.m., the young lady proceeded toward her home at 2225 Boas Street in Penbrook. She was running on the pavement on the north side of Walnut Street in a westerly direction in that borough when these three defendants, who were occupants of

an automobile driven by Barnd, approached her in the car and endeavored to attract her attention. When she continued without responding to their advances, the car was driven close to the curb and one of the defendants spoke to her. She slackened her pace, looked into the car, and then started running again. Walnut Street extends east and west in Penbrook. When the girl came to the intersection of Walnut and Boas Streets, she turned to the right to proceed north on Boas Street to her home. The driver of the car likewise turned north on Boas Street and passed the girl.

Miss Sutton testified that on Boas Street one of these defendants, Goff, accosted her and asked permission to walk with her to her home, but that she said: "I got this far by myself, I can get the rest of the way by myself." When he persisted in following her, she stated that she walked toward a neighbor's house pretending that it was her home, and in the hope that her pursuer would thereby be induced to leave. According to Miss Sutton, while she was thus engaged with this one defendant, the two others, Jackson and Barnd, approached in the automobile from the direction opposite to that in which she had been walking. They got out of the car. One of them attempted to kiss her and she slapped his face. She was hit over the back of her neck. One of the defendants took her by the arm and another took the other arm, and the third grabbed her by the leg. They forced her into the automobile. She stated she did not go willingly. There is some evidence that she may have fainted.

Miss Sutton testified that they returned after taking her for a brief ride and she got out of the car near her home. Immediately thereafter the three of them grabbed her again and pulled her back into the car. On this occasion she threw her pocketbook toward her house, and later the pocketbook was found by her father at the place where she had thrown it. Defend-

ants say she didn't scream. She says she did, but that they put their hands over her mouth and put up the windows of the car so she could not be heard.

There is an irreconcilable dispute, however, between Miss Sutton and these three defendants as to what occurred on Boas Street and thereafter. Defendants' testimony shows that they turned off Walnut Street, north on Boas Street, and drove past the girl; that the car was stopped in an alley near its intersection with Boas Street in an endeavor to intercept the girl's progress, but that she continued past the car without stopping. The driver then backed out of the alley and followed the course taken by the girl generally north on Boas Street.

One of the defendants, Goff, according to their testimony, got out of the car. Goff himself testified that he got out of the car and leaned against a tree and as the girl approached the tree, "I stuck my head out and said 'Boo,'" and asked permission to walk with her to her home. According to defendants' evidence, Barnd and Jackson remained in the car and proceeded in the same direction on Boas Street.

The two remaining occupants testified that after an interval they returned in the car to find defendant Goff sitting in front of the victim's house on a step along the pavement. Jackson and Barnd got out of the car, according to the defendants' testimony, and the various defendants walked back and forth in front of the young lady's house with her in an endeavor to induce her to get into the car. A light was burning on the porch at that time, according to the defendants, and the girl's mother was in the house, according to the Commonwealth's testimony. It was testified that one of the defendants kissed the girl in front of her home, and all of the defendants testified that the young lady willingly got into the car to go for a ride.

What occurred on Boas Street is, of course, significant. It is important on the question of credibility and has a bearing on the background and circumstances surrounding this unfortunate episode. However, this case must be viewed in its correct perspective and the essential question as to whether or not rape was committed on this night depends on what transpired after this girl entered the automobile.

Rape is the unlawful carnal knowledge of a woman forcibly and against her will. The Commonwealth claims that on the night in question these defendants forcibly and against the will of this young lady had sexual intercourse with her on numerous occasions. The essential question here then is what transpired at the time these attacks are alleged to have been made. Defendants drove the car to a lonely road "with grass in the center," where the car was stopped. There they admitted they disrobed the girl and had intercourse with her. Defendants all said that she gave her consent to the acts of intercourse. The girl's testimony, however, is that she was forced to have intercourse with these defendants against her will. The jury believed that this young girl had not consented to what was done to her that night.

Miss Sutton testified that when she was in the front seat of the car on the grass road, the defendants started to take her clothes off. She stated that she tried to get out, and did get out partially clothed. Her shoes and socks had been taken off in the car and her blouse was then partially open. She said that Goff walked up to her and she said: "Why don't you let me go?", and he said: "I am afraid of them, they might beat me up." She testified that it was then that she for the first time realized what they were going to do.

She was returned to the front seat where she was disrobed by defendants. She tried to hit them, but they

held her arms. Two held her while a third had intercourse with her. They took turns in this process, according to her testimony, and each one of them attacked her in this manner when she was in the front seat.

She tried to get out but she could not. One of them burned her with a cigarette lighter, cursed and said: "Maybe this will hold you." One time she tried to get away and was told: "It wouldn't do you any good because if you tried to get away we could run over you with the car." She described these events as a series of getting out and being pulled back into the car. She stated that she screamed but they put their hands over her mouth. The girl testified that each of the defendants had intercourse with her two times at the place where they were stopped along the grass road. She said that she told them they could not get away with this, that her father would have them arrested, and defendants said that would do her no good, or words to that effect.

Miss Sutton testified that they left the dirt road and that other acts of intercourse occurred by all three of them at some other place which she was not able clearly to identify. She said she asked to go home again and again. As they drew into the neighborhood of her home she opened the door and jumped out in her bare feet. She was half a block from her house at the time. She walked toward her home, holding up her shorts with one hand because the zipper had been torn in the rear, some time after 2 a.m. on the morning of July 31st. Her mother was standing in the doorway, and Betty Jane Sutton was in the middle of the street crying.

The same night this young lady was taken to the Harrisburg Hospital and was examined by Dr. Roberts, an interne. He testified that there was bloody fluid on the outside and a laceration inside of the vagina, and that the hymen was in shreds with bloody fluid oozing from the edges. He testified to a blister

on the left leg where the girl stated she was burned by a cigarette lighter. He also testified as to black and blue marks on the arm and abrasions on the thigh. Dr. Moffitt testified that the hymen was a membrane spanning the orifice of the vagina.

Notwithstanding the fact that this girl admittedly, according to these defendants, had refused to accept their overtures when they approached her on Walnut Street, and refused again when the car was parked in the alley along Boas Street, defendants stated, nevertheless, that she willingly accepted their advances in front of her own home with a light burning on the porch a few feet away, the mother being at home at that time. Defendants testified that this young lady willingly got into the car under these circumstances, and that she permitted defendants to take indecent liberties with her while riding in the car before they reached the lonely grass road. There they testified that she was a willing participant and was coöperative in the first acts of intercourse of each of these defendants in the car, and in the subsequent acts of intercourse as well.

The story of the three defendants is in substantial agreement as to the details of what transpired that night. They each testified as to this young lady's coöperation and consent. They each denied having burned her with the cigarette lighter. They stated that they left her out of the car in her bare feet because she did not want to get out in front of her own home. One of these defendants discovered the shoes of this young lady in his car that night, and when he became aware the next day that a search was being made for defendants, he removed the shoes and threw them in a gully near the place where the car was parked at the Military Reservation.

Under all these facts, it was for the jury to say whether this girl willingly subjected herself to what

transpired. The jury by their verdict found that intercourse was had with her forcibly and against her will. As bearing on the question as to whether she consented, the jury had the right to consider the black and blue marks on her arm, the abrasions on her thigh, the burn on her leg, and that she was cursed and told to hold still at the time of the burn.

The jury could also consider the girl's testimony as to the threats to run over her with the car if she would attempt to get away, the torn zipper, the manner in which she left the car in her bare feet. They had the right to weigh the circumstances that defendants had been drinking that night and continued to consume substantial quantities of beer during the time they had this girl in the car.

The jury could also consider that this girl found herself on this dark and unknown road with these three defendants, and determine what bearing that had on her ability effectively to resist under the circumstances. The jury could consider all of these things and balance this testimony on the part of the girl against the testimony of these defendants that she willingly participated.

After weighing all of the evidence, the jury believed the story of this young girl that the acts of intercourse were had forcibly and against her will. In Commonwealth v. Oyler, 130 Pa. Superior Ct. 405, 407 (1938), that court said:

"The testimony of one witness may be sufficient to sustain a conviction of rape: Com. v. Kretezitis, 111 Pa. Superior Ct. 5, 9, 169 A. 417; Com. v. Ramstedt, 113 Pa. Superior Ct. 548, 173 A. 772. However, here the admitted replies of defendant to the state policemen and his conduct were corroborative of the plaintiff's testimony. It is [only] when the testimony of one witness is so indefinite, contradictory or unreliable that it would be unsafe to rest a conviction thereon

that corroboration is required: Com. v. Cyaus, 88 Pa. Superior Ct. 227, 230. We find nothing in this record that would indicate that it would be unsafe to convict on the testimony as given.

"Defendant admitted that he was guilty of fornication. The jury was therefore called upon to determine whether the intercourse was had 'forcibly and against her will.' Her resistance, outcry and conduct after the felony was committed were all matters that bore upon the disputed question, but these were matters for the jury. Certainly the trial judge could not properly have said as a matter of law that her conduct was inconsistent with innocence of wrongdoing on her part."

See also Commonwealth v. Eberhardt et al., 164 Pa. Superior Ct. 591 (1949) ; Commonwealth v. Goldberg et al., 162 Pa. Superior Ct. 203 (1948) ; Commonwealth v. Allabaugh, 162 Pa. Superior Ct. 490 (1948) ; Commonwealth v. Feist, 50 Pa. Superior Ct. 152 (1912) ; Commonwealth v. Ramstedt, 113 Pa. Superior Ct. 548 (1934) ; Commonwealth v. Krick, 164 Pa. Superior Ct. 516 (1949).

These defendants were all interested parties. The jury could determine as between defendants and this young lady whom they believed was telling the truth about what occurred on this unfortunate night. The jury believed the young girl's testimony and concluded that these defendants were guilty of rape. There was sufficient evidence to support the jury's finding.

It is contended by defendants that the court erred in admitting the evidence of Dr. Donald Roberts, an interne at the Harrisburg Hospital, who examined Betty Jane Sutton on the early morning of July 31st, Dr. Roberts not then being licensed to practice medicine under the laws of Pennsylvania. It appeared from the testimony that the witness was a graduate of the Medical School of the University of Pennsylvania had been associated as a student with the Old Penn-

sylvania Hospital, Philadelphia, for a period of eight months and with the Philadelphia General Hospital for a period of six months, and further, had been an interne at the Harrisburg Hospital for one month prior to the examination of this girl; and that the nature of his work at these hospitals included the physical examination of patients, the prescription of medicine, and treatment under supervision. The doctor then proceeded to give testimony as to what he found as a result of the examination.

In his testimony Dr. Roberts was strictly limited to the factual observations which he made of the girl and was not permitted to venture any opinion whatsoever. Nowhere in this record does it appear that Dr. Roberts drew any conclusion based upon his examination. He did not go beyond an actual description of what he had seen at the time of the examination. The defense argues that more than ordinary skill and knowledge are required to make such an examination. Dr. Roberts, after four years as a medical student and 15 months' experience in hospitals, in our judgment, is shown by the record to have acquired certain skill and knowledge. Dr. Roberts was only permitted in this case to apply his skill and knowledge to a description of the injuries which he actually observed that night. After careful deliberation, we feel that we committed no error in admitting Dr. Roberts' testimony as to the factual results of his examination.

"Opinion evidence," as that term is used in law, has reference to testimony of a witness given or offered at the trial of an action, wherein the witness expresses an opinion from the witness stand concerning the existence or nonexistence of a fact, and is to be distinguished from the admissibility of mere statements or recollections of witnesses in testifying as to the existence of facts: 20 Am. Jur. §764. In our judgment, Dr. Roberts was doing nothing more than giving his rec-

ollection as to the existence of facts as he found them on the night he made his examination.

A careful examination of the Supreme Court's decision in Clark et ux. v. Horowitz et al., 293 Pa. 441, 447 (1928) indicates that court considered a hospital interne's opinion admissible under certain circumstances: The court said:

". . . In this case the witness had the advantage of a medical college education and important clinical experience in a noted medical institution. His testimony was based on his own observation, his opinions were his own and the value of his testimony was a matter for the determination of the jury."

Although the interne was testifying to a mental condition, nevertheless the pertinent language of the Supreme Court seems to have a much broader application. And Wigmore on Evidence (3d Edition), at section 569, cites this case in support of the following proposition:

"The common law, it may be added, does not require that the expert witness on a medical subject shall be a person duly licensed to practice medicine. . . ."

And again Wigmore, at section 687, makes this well-reasoned observation:

". . . if, as is usual, the objection is directed against a professional man, because he has merely graduated from an acceptable medical school and has not practiced extensively, the objection is unpractical. According to the old methods by which a medical training was gained mainly from actual service in an apprenticeship, an active and prolonged experience in practice for a considerable period might be essential. But the modern training of a medical school does not involve merely the perusal of books; it embraces a personal observation of disease and its remedies. The cultivation of judgment which may be attained in such a school ought

to qualify without any requirement of a term of subsequent practice.

"There is little definite authority on the subject; but the matter should rest in the trial judge's discretion."

A footnote to the above quotation cites the case of Tullis v. Kidd, 12 Ala. 648, 650 (1847), which was the authority also relied upon by our Supreme Court in Clark v. Horowitz, supra, and it should be noted that the Alabama case was not one involving mental condition.

In Micciche v. Forest Hill Cemetery Assn. et al., 55 D. & C. 620, 625 (1945), Judge Hoban, in the course of a discussion on expert testimony, made this observation:

". . . The possession of a license issued by legal authority, particularly in the medical profession, would be prima facie evidence that the licensee possessed at least minimum knowledge and skill considered essential by the licensing authority, but does it follow as a matter of sound reasoning that only a licensed person can possess such knowledge and skill? We think that is not a valid conclusion and that the determination of the qualifications of one proposed as an expert witness must be determined by inquiry into these qualifications as a matter of fact. . . ."

See 32 C. J. S. §537; also §480.

In view of the manner in which the court limited Dr. Roberts' testimony, we feel that his evidence could not be considered as opinion evidence. He gave testimony on the witness stand as to his observations. It is true that his knowledge and training qualified him to discern and describe what he found in that examination. Should this testimony, however, be considered as opinion evidence, we are of the view that in the light of the authorities above cited the testimony was properly received. We are convinced then that we were

correct in our ruling in permitting the interne to testify to the facts as he found them in his examination.

The cases cited by defendants, having to do with the admissibility of hospital records containing therein the opinions of an interne, in our judgment are not in point on the question of admissibility of evidence of an interne concerning his observation of a person's physical condition; where that interne is subject to cross-examination in open court concerning his knowledge and where he is not asked to express an opinion. In Travellers Insurance Company v. Heppenstall Company, 360 Pa. 433, 439 (1948), the Supreme Court held that a hospital record containing an interne's opinion was inadmissible because of the absence of any knowledge as to the interne's expert skill and a lack of opportunity on the part of defendant to cross-examine the interne as to his qualifications and the basis of his conclusions. Clearly, a hospital record containing such an opinion should be excluded.[1] In this case, however, the interne testified from the stand and was subject to cross-examination on the extent of his knowledge and as to his findings.

Defendants complain that the court erred in charging the jury as follows:

". . . If you find that each of these defendants at the outset of this series of acts of sexual intercourse committed those acts, the initial acts, with force and against Miss Sutton's will, that would be sufficient evidence to convict these defendants of rape, regardless of the circumstances surrounding the subsequent acts of intercourse of each of the defendants. But the circumstances surrounding the subsequent acts of inter-

---

[1] In the several other cases cited by defendants, hospital records are excluded for substantially the same reasons as those assigned by the Supreme Court in the Heppenstall case: Paxos v. Jarka Corporation, 314 Pa. 148, 154, 155 (1934); Lane v. Samuels, 350 Pa. 446, 450 (1944); Leed v. State Workmen's Insurance Fund, 128 Pa. Superior Ct. 572 (1937).

course should also be taken into consideration by you as bearing on the question as to whether or not she consented in the first instance."

It is their contention that in using the words "initial acts" in this portion of the charge, the jury could have construed this phrase to have reference to those events that occurred earlier that night, not directly related to the intercourse. Such construction, it is argued, would have confused the jury, since it could have meant in their mind that if force was used in connection with these preliminary events, in the matter of getting Betty Jane Sutton into the car, for example, this would be evidence from which the jury could have convicted defendants of rape. We think it is clear from this portion of the charge that here, in using the term "initial acts," the court referred to the initial acts of intercourse, namely those things which transpired at the "outset of this series of acts of sexual intercourse."

It is of course fundamental that the court's charge must be read as a whole: Commonwealth v. Becker, 326 Pa. 105 (1937) ; Commonwealth v. Welch, 291 Pa. 40 (1927) ; Commonwealth v. Stelma, 327 Pa. 317, 323 (1937) ; Commonwealth v. Winter, 289 Pa. 284 (1927) ; Commonwealth v. Cargill, 357 Pa. 510 (1947) ; Commonwealth v. Moyer, 357 Pa. 181 (1947). This portion of our charge then must be read in its context, and when this is done we fail to perceive how there could be any confusion created in the meaning of this language.

We defined the elements of the offense charged in the indictment, reviewed the evidence of the Commonwealth and defendants, gave a recapitulation of the essential facts in dispute, and then outlined for the jury the legal principles that would apply to the particular facts in this case. The evidence showed a series of acts of intercourse committed by these defendants, and we do not see how the jury could have been con-

fused by our referring to what occurred in the first instance at the time of defendants' carnal knowledge of the victim as the initial acts of intercourse of each of defendants.

We particularly left it to the jury to determine whether these initial acts of intercourse were done forcibly and against the will of the victim, and whether all of the acts of intercourse that occurred that night were against the will of Betty Jane Sutton was clearly left to the jury under the entire charge of the court. Miss Sutton had testified to the force that was used when defendants first had carnal knowledge of her on the front seat of the automobile, and she said that thereafter everything was "all jumbled up," and that the entire night was a series of getting out and being pulled back into the car.

An examination of the charge as a whole, we feel, reveals that it was entirely fair from the standpoint of defendants. We directed the jury's attention to defendants' contention that this sordid enterprise was a coöperative event, and fully reviewed defendants' testimony. Defendants expressed no desire to have us elaborate on this portion of the charge in any way when at the conclusion of the case we gave them an opportunity to request further instructions, nor did they indicate that they felt the charge needed further clarification on this point.

Defendants assigned as another reason for a new trial that we erred in refusing the request of counsel at the conclusion of our charge additionally to instruct the jury "to view the testimony of the female with extreme care." In Commonwealth v. Berklowitz et al., 133 Pa. Superior Ct. 190, 193 (1938), the Superior Court said:

"In prosecutions for rape the courts have laid down certain tests which are to be employed in ascertaining the truthfulness of the party in making a charge of

the character here involved. The authorities are in agreement that her evidence should be carefully considered in determining whether the act was with or without her consent. . . ."

An examination of our charge reveals that we emphasized and reiterated the importance of considering carefully the testimony of Betty Jane Sutton. We charged the jury:

"On the one side you have the testimony of this young girl, Betty Jane Sutton, and on the other side these three defendants. Nobody but those people know what occurred. What happened on the grass road where this carnal knowledge was first had, that is what you must determine because events took place there and subsequently which the Commonwealth charges amounted to rape. You will then have to weigh the testimony of Betty Jane Sutton carefully against the testimony of these defendants. . . ."

In accordance with the ruling of the Superior Court in Commonwealth v. Oyler, supra, we charged that the testimony of one witness may be sufficient to sustain a conviction of rape, and that it is only when the testimony of that witness is so indefinite, contradictory and unreliable that it would be unsafe to rest a conviction thereon that corroboration is required. And then we charged:

". . . if you believe Betty Jane's story, after carefully considering her testimony and all of the evidence, and you find that her story is not contradictory and not indefinite, then her testimony is sufficient to sustain a conviction. . . ."

And again, after reviewing all the evidence, both of the Commonwealth and of defendants, and in connection with our recapitulation of the testimony, we charged that:

". . . You must consider with care not only the testimony of Betty Jane Sutton, but that of defendants as to what happened."

The court emphasized the fact that Betty Jane Sutton was the only witness who testified for the Commonwealth as to what occurred on the grass road and elsewhere where this intercourse was had, and that it was important for the jury to consider carefully her testimony. At the conclusion of our charge we were not asked by defendants merely to reiterate what we had already said with respect to the duty to carefully consider the evidence of the victim in this case, but defendants asked us to charge that it was the duty of the jury to consider her testimony with "extreme care." In the light of the instructions which we had already given, we think there was no error in refusing this request. We feel that the court protected the rights of these defendants and gave full consideration to their contentions, as we were required to do in view of the great importance of this case, not only to defendants, but to the Commonwealth as well. We do not believe, however, at that point of the trial, immediately before the retirement of the jury, defendants were entitled to the additional instruction to view Betty Jane's testimony with "extreme care."

It is claimed by the defense that the court erred in overruling the objections of defendants to the inference drawn by the Commonwealth in its summation that Betty Jane Sutton was a virgin. The difficulty with defendants' proposition on this point is that we have no record of the remarks of the district attorney. No effort was made to have those remarks placed on the record. Where a stenographic record is not made of the argument, some method must be used to put the objectionable remarks on the record. It may, for example, be done either by agreement as to what were those remarks, or by an affidavit, or by bringing the

particular objectionable remarks to the attention of the trial judge. There was no motion made to withdraw a juror.

Objectionable remarks in an address of counsel to the jury must not only be excepted to, but must also be placed upon the record. Otherwise, we cannot review the matter since the record does not disclose the matters concerning which objection was made: Commonwealth v. Flori, 300 Pa. 125 (1930); Commonwealth v. Del Vaccio, 299 Pa. 547 (1930); Commonwealth v. Eisenhower, 181 Pa. 470 (1897); Commonwealth v. Kline, 66 Pa. Superior Ct. 285 (1917).

Another ground set forth by defendants in their motion for new trial is that the court did not in its charge adequately define the requirements necessary to prove the crime of rape. This point has not been pressed by defendants and could not well be argued. We believe an examination of the charge will clearly reveal that this contention has no merit. We defined the crime of rape in the language of the act of assembly, and throughout our charge we emphasized that it must be shown that defendants had carnal knowledge forcibly and against the will of Betty Jane Sutton.

Defendants have advanced other reasons in support of their motions but have not argued them. We will therefore not discuss them, but do take this occasion to point out that we have considered all of these other reasons and find no merit in them.

We have carefully reviewed this record and can find no error in the trial of this case. The case was submitted to the jury on a charge which we believe was eminently fair to these defendants. The question was for the jury. They have found defendants guilty. There is evidence to support their finding and we have no right to disturb their verdict.

And now, January 22, 1952, the motion of defendants for a new trial and in arrest of judgment is overruled and judgment is directed to be entered on the verdict; the district attorney is directed to call defendants for sentence.