## Commonwealth *v.* Becker, Appellant.

106

Argued March 22, 1937. Before KEPHART, C. J.,
SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*John W. Conrad,* of *Conrad & Conrad,* with him *Clarence O. Morris,* for appellant.

*Robert M. Morris,* District Attorney, with him *Alex S. Scribner,* Assistant District Attorney, and *William A. Sykes,* for appellee.

OPINION BY MR. JUSTICE DREW, April 12, 1937:

The defendant, John Becker, was indicted and tried for the murder of Kathryn Bracken, who was employed by the Pittsburgh & Shawmut Railroad Company as a telegraph operator at the Shawmut signal tower in Brookville, Jefferson County. The jury returned a verdict of guilty of murder in the first degree and recommended the death penalty. From the judgment and sentence imposed, after refusal of defendant's motion for a new trial, this appeal was taken.

The record discloses a cruel and sordid crime. Some of the facts are of such a revolting nature that they do not bear repetition here; they may be found in the nine hundred and forty-five pages of testimony. Suffice it to say that the body of the deceased was discovered lying in a shallow ditch at the bottom of a twenty-five foot embankment in the rear of the tower where Miss Bracken worked, some time between 9:30 and 10 o'clock on the night of April 10, 1936. It bore evidences of a brutal attack. There were five long scalp wounds, all two-sided or V-shaped, evidently inflicted by a blunt triangular weapon. Across the throat were three deep gashes, one of which had severed the jugular vein. The left wrist had been cut to the bone. Death was due to

hemorrhage from the throat and wrist wounds. It was clear that the motive for the attack was criminal assault.

The signal tower contained two rooms, and entrance was provided by a flight of five or six wooden steps. In the outer room, known as the "trainmen's room," was a counter, a trainmen's register and a telephone. Between this and the operator's room, where deceased performed her duties, was a door the upper and lower halves of which swung separately. The top of the lower half of this door was a shelf on which an inkwell, the trainmen's register and other papers were customarily kept.

There can be no doubt that the crime was committed in the operator's room. This was conclusively shown by the blood-stained walls and floor, and complete disorder of the room. Papers were scattered about in confusion. The deceased's telephone breastpiece and head set were found on the floor. A pair of blood-stained bloomers lay near by. The telephone headpiece, the electric light bulbs in both rooms, the inkwell, several sheets of paper and the door between the rooms, all bore traces of blood and bloody fingerprints. A heelprint, dried in blood, was observed by officers upon the zinc floor covering near the switchboard. Close to the door lay a large inkwell, streaked with blood. Through this doorway was a path of blood almost a foot wide, extending in a narrowing strip through the trainmen's room and down the steps outside the tower. A trail, caused by the dragging of an object in the loose material forming the embankment, led from the steps to the place where the body was discovered. Deceased was to be on duty that evening until 10 p. m. At about 9:35, Reed Lettie, who was to relieve her, arrived and found the rooms as above described. He summoned help and some twenty minutes later the body was discovered.

Among those questioned by the police the night of the killing was the defendant, who had been working as a substitute night watchman at a glass plant a short

distance from the tower. At that time he was asked merely if he had seen "any hobos or colored fellows around," and where they usually "hung out." He denied having seen anyone. On April 24, he was requested to appear at the district attorney's office. He did so voluntarily, and there declared he had made the regular rounds of the plant that night, and had registered them on the time clock at 7, 9 and 11 o'clock. The next morning, April 25, he made a substantially similar statement. That afternoon he was again interrogated and at that time a knife was found in the hip pocket of his trousers. Dirt and a reddish-brown substance covered the larger blade. He was then arrested, taken the next day to the State Police station in Clearfield, where he was examined at length. The questions and answers were taken down and transcribed by a court stenographer, and were later placed in evidence without objection. He then admitted that he "had lied" when he said he had not been away from the glass plant the night of the crime, and when he stated that he had made the nine o'clock round. He said he had concealed the fact that he had not made the round by changing the dials on the time clock, that he "had to have something to show that he had made the round." He claimed he did not make the round because he was asleep at the time. He admitted he had burned the old dials. He then explained the stains on his knife by saying he had used it to cut up beef kidneys for his dogs.

Joseph Becker, a cousin of the defendant, was interrogated by the police. The story he told was that at approximately nine o'clock on the evening of April 10, he had gone to a point near the tower to steal coal from a loaded coal car; that he had heard peculiar noises emanating from the direction of the tower; that on walking toward it he saw defendant standing on the tracks some thirty or forty feet away from him and near the place where the victim's body was found. He said he did not see the body, that the night was dark,

and that defendant did not see him. He declared that on the following day he met defendant, and told him he had seen him the night before, and that the defendant replied, "Shut your mouth—It's all over town now."

On the morning of April 28th, the defendant was again questioned. He denied all knowledge of the commission of the crime. His cousin was then brought in to confront him, and when asked, "Who killed Katie Bracken?" he replied, "John Becker." The defendant answered, "I didn't." Then another question was put, "Joe, who was it that you saw at the tower on the night Katie Bracken was murdered?" He replied again, "John Becker." The defendant remained silent. An officer then suggested that he might prefer to talk to him alone. In this defendant acquiesced. After the two had spent some time together, a statement containing information received from questioning the prisoner, was typed by the officer and read to and signed by defendant in the presence of four subscribing witnesses.

In this statement defendant declared that he had arrived at the glass plant about 5:30 the night of the crime; that at 7 he made his first round; that he slept from 8 to 8:30; that he then went to the tower, made improper advances to Miss Bracken, was repulsed, raised the inkwell from the shelf of the half-door with his left hand and struck her on the side of the head; that she fell to the floor and he pulled out his pocket knife and slashed the blade across her throat about three times; that he cut her hands so that she could not fight him; that blood splashed all over the office; that he "got her by her feet and dragged her body out of the office, through the registry office, down the steps, and I then rolled her body down the embankment just near the tower steps"; that he then tried to have intercourse with the corpse, but was unsuccessful; that he walked away and washed the blood from the knife in the water of a ditch along the railroad track. He said he then returned to the glass plant, and "faked the dial in the

clock to show that I made the nine o'clock round."
Defendant also demonstrated the manner in which the
crime was committed, using an officer as the victim and
a comb as the knife.

On the afternoon of the same day, defendant was
again questioned. His answers, as taken down by the
stenographer, were substantially similar to those pre-
viously made, although there were minor variances as
to details. On the evening of April 29th, he was taken
to the offices of a physician for a mental and physical
examination at which defendant's family physician was
also present. He was questioned by the medical men in
attendance, and admitted the killing, again demonstrat-
ing how he had accomplished it.

The Commonwealth relied for conviction principally
upon the admissions of guilt in the statements made by
the defendant, Joseph Becker's identification of him at
the scene of the crime, and the testimony of a qualified
pathologist that the blood of the deceased was type
number one, that of the defendant type number two,
and that he removed human bloodstains of type number
one from defendant's trousers. The defense practically
conceded that the deceased was murdered, and that it
was murder of the first degree. Their evidence was
restricted to proving that defendant was not the guilty
party.

Forty assignments of error have been raised on this
appeal. Complaint is chiefly directed against the charge
as a whole, against the admission in evidence of the
defendant's statements, and the refusal to grant a new
trial because of after-discovered evidence. Many of the
assignments are without merit but because of the
gravity of the case we have seriously considered all of
them.

The first three assignments attack the charge as being
inadequate, misleading and prejudicial. These objec-
tions are entirely baseless. The court fully and fairly
presented the case to the jury in a carefully prepared

charge of forty-eight pages. The facts and law applicable were clearly, accurately and sufficiently set forth. The trial judge is to be commended for his calm and dispassionate presentation of a very trying case. Too often we are compelled, in cases of this character, to grant a new trial for error in this respect. The court reviewed the testimony at much greater length than was necessary, and this, and its statement of the law, were so satisfactory to counsel for defendant, that only the customary general exception was requested. If the court referred at greater length to the testimony of the Commonwealth, it was only because more evidence was offered on that side: *Commonwealth v. Riggs,* 313 Pa. 457, and cases there cited. This objection, as applied to the facts of the instant case, is little more than a complaint that the trial judge did not argue defendant's cause to the jury: *Commonwealth v. Hadok,* 313 Pa. 110.

Assignments four to ten inclusive and twenty-one are directed to alleged omissions in the charge, to which, as already mentioned, only a general exception was taken. At the conclusion of the charge the court inquired whether counsel desired it to further instruct the jury or correct any portion of the charge as given. The response of defendant's counsel was in the negative. Only two written requests for charge were filed by defendant and both of these were affirmed. As we said in *Commonwealth v. Bruno,* 316 Pa. 394, 402, "Where the court's charge substantially covers the points in dispute, and no further requests for charge are made by defendant's counsel, although opportunity for such is given, defendant cannot on appeal complain of the inadequacy of the charge without showing that the alleged omissions contributed to the jury's verdict to defendant's prejudice: *Commonwealth v. Pacito,* 229 Pa. 328; *Commonwealth v. Varano,* 258 Pa. 442; *Commonwealth v. Winter,* 289 Pa. 284; *Commonwealth v. Mendola,* 294 Pa. 353." No such showing was made

here. The proper function of a charge is to instruct the jury as to the law applicable to the facts. This renders necessary some narration of the evidence, but the trial court is not required to recite all the testimony in great detail: *Commonwealth v. Flood,* 302 Pa. 190. It is a matter for its sound discretion: *Commonwealth v. Caraffa,* 222 Pa. 297. The charge presented fairly the respective contentions of the parties, and ample opportunity was given to secure further instructions if desired.

Assignments eleven to twenty inclusive relate to alleged misquotations of evidence in the charge. We have carefully examined these assignments and find nothing to support them. Certainly trivial differences, such as those complained of, could not possibly prejudice defendant. It is established law that only misstatements of fact that are prejudicial furnish ground for reversal, and such misstatements must be called to the attention of the court before the jury retires: *Commonwealth v. Stabinsky,* 313 Pa. 231. While this was not done, we have nevertheless searched these assignments for merit because a man's life hangs in the balance. We are convinced that none of the alleged misstatements could possibly have had any serious effect upon the jury's verdict, and complaint concerning them is therefore unavailing: *Commonwealth v. Schroeder,* 302 Pa. 1; *Commonwealth v. Winter,* supra. Moreover, it is by no means certain that the "misquotations" were actually such. They were isolated extracts abstracted from the charge. In fairness, the charge must be read as a whole and excerpts therefrom must be read in connection with the context: *Commonwealth v. Touri,* 295 Pa. 50. "It cannot properly be separated into parts and these treated piecemeal": *Commonwealth v. Glenn,* 321 Pa. 241. When the charge is read as a whole, with the testimony in mind, it is obvious that it is an accurate and adequate exposition of the essential evidence in the case. The jury was expressly cautioned, in addition, that its

version of the testimony, and not the court's, should govern in case of conflict.

We now pass to a consideration of assignments twenty-two, twenty-three and thirty which complain primarily that the court permitted the district attorney, in cross-examination of some of defendant's character witnesses, to ask the following question: "Did you ever hear prior to April 10, 1936, that defendant had been accused of killing a man?" and allowed the witnesses to answer. The record reveals that these witnesses had been asked on direct examination whether defendant bore a reputation in his community of being a peaceful and law-abiding citizen, and had replied in the affirmative. Thereafter, before cross-examination, the question about to be put was stated at side-bar, the court asked defense counsel if there was any objection, and there was no answer.

The contention of the defense is that questions pertaining to specific offenses cannot be asked character witnesses as "rebuttal" of evidence of good reputation. This is perfectly true as a legal principle but has no application to what was done in the instant case. The questions were asked by the Commonwealth on cross-examination, and not in rebuttal. If the witnesses had been called in rebuttal, they would have been offered to establish bad reputation, which, like good reputation, cannot be proved by evidence of particular acts: *Commonwealth v. Jones,* 280 Pa. 368, at 370. The proper function of cross-examination in such a situation, the witness having qualified, is not to affirmatively establish the fact of bad reputation, but to break down the basis of the testimony of the witness as to good reputation. A distinction is drawn between cases where it is sought to prove particular acts of misconduct and those where the purpose of the examination is to test the accuracy of the testimony by showing either that the witness is not familiar with the reputation concerning which he has testified or that his standard of what constitutes

good repute is unsound. An overwhelming majority of jurisdictions, including our own, recognize such a distinction: *Commonwealth v. Thomas,* 282 Pa. 20; *Commonwealth v. Jones,* supra; *State v. Rowell,* 172 Ia. 208; *Regina v. Wood,* 5 Jur. 225; Wigmore on Evidence (2d ed. 1923) section 988; 71 A. L. R. 1505. The admission of testimony of good reputation is of doubtful value and often deceptive where there is not applied to it the acid test of cross-examination to prove the accuracy of the testimony and the standard by which the witness measures reputation: see *People v. Laudiero,* 192 N. Y. 304.

This rule does not permit of the introduction of substantive evidence of the accused's previous conduct. Such testimony is admissible only to discredit the character witness. Where the record discloses that the actual purpose of such cross-examination was to show that defendant had committed a specific crime of which he is not now accused, and not to test the credibility of the character witness, it will be held improper if it tends to prejudice the accused. The problem in each case is to determine whether the inquiry at cross-examination is directed to the witnesses' hearing of the rumor, or is directed toward the substantive fact of the defendant's misconduct. So in *Commonwealth v. Thomas,* supra, and *Commonwealth v. Jones,* supra, it was held reversible error for the district attorney on cross-examination of defendant's character witnesses to ask whether they did not *know* that defendant was a married woman living in open adultery with the man she was charged with having killed. In the former case, we declared, "It is manifest from a reading of the record in the instant case that the questions propounded by the district attorney were not for the purpose of either testing the credibility of the witnesses or the extent of their knowledge of the reputation of the accused. Such questions as were here propounded ought not to be allowed even for that purpose. Under certain circumstances, on cross-examination of a character witness, it may be proper

to inquire whether the witness has ever *heard* persons in the neighborhood attribute to the defendant particular offenses, but it is never permissible for any purpose to interrogate the witness as to his *knowledge* of another specific crime laid at the defendant's door." (Italics added). In the instant case, the questions were obviously directed not at the witnesses' knowledge of the truth of the alleged rumor that defendant had killed a man, but at whether or not they had heard he had done so. In *Commonwealth v. Colandro*, 231 Pa. 343, we declared inter alia, "A witness 'cannot be asked questions to elicit his knowledge of particular acts as distinguished from what he has heard'; . . . the inquiry must be limited to the general speech of the community on the subject." The statement in that case, at page 355, "Had these questions been objected to it would have been the duty of the court to have excluded them," referred to the fact that the questions asked on cross-examination were, in the opinion of the court, not limited to the particular trait of character involved in the commission of the crime charged. See also *Commonwealth v. Thomas,* supra. Here, on the other hand, the issue was defendant's reputation as a peaceful and law-abiding citizen. And the questions put on cross-examination, now objected to, related directly to such traits.

The twenty-fourth assignment attacks the accuracy of the statement in the charge that "In this case we have to deal with that kind of murder in the first degree described as 'wilful, deliberate and premeditated' and also with that kind of murder brought about in the perpetration of, or while attempting to perpetrate a rape." Defense counsel insist the word "only" should have been inserted after the word "deal" so that the first part of the sentence would conform exactly with the charge of Mr. Justice AGNEW in *Commonwealth v. Drum,* 58 Pa. 9. The omission of "only" was here necessary since the case involved not merely first degree murder where the killing was "wilful, deliberate and pre-

meditated" but also a killing in the perpetration of or attempt to perpetrate a rape. Inasmuch as there are no degrees below first degree where the killing is of the latter type, there was no necessity for inserting the words "in the first degree" in the last part of this sentence of the charge.

The twenty-fifth assignment complains that the jury was misled as to the effect to be given circumstantial evidence. Inspection of the language used shows that it was taken verbatim from the opinion of Chief Justice Gibson in *Commonwealth v. Harman,* 4 Pa. 269, 271, 272, which has since been approved by this court in *Commonwealth v. Thomas,* 275 Pa. 137; *Commonwealth v. DuBoise,* 269 Pa. 169; *Commonwealth v. Kovovic,* 209 Pa. 465. The charge as to reasonable doubt and the burden of proof, objected to in assignments twenty-six and twenty-seven, is substantially that approved by this court in *Commonwealth v. Drum,* supra, and since followed numerous times.

The twenty-eighth assignment concerns the refusal of the trial judge to permit counsel for defendant to question a Commonwealth witness regarding a prior story he had told police, after he had admitted it was not what he had said upon the witness stand. It is sufficient to say that although the original exclusion was improper, the statements previously made were thereafter read into the record and defendant's counsel later took full advantage of them on cross-examination. The improper exclusion of evidence is harmless where that evidence is subsequently offered and received at a time when full advantage can be taken of its admission: Cf. *Commonwealth v. Quaranta,* 295 Pa. 264; *Commonwealth v. Bezek,* 168 Pa. 603.

Assignments twenty-nine, thirty-one, thirty-two and thirty-three contend that it was error to admit the confessions of defendant in evidence. The allegation is that they were not voluntary. Counsel admit, in their brief, that there was contradictory testimony which was

for the jury and that now these assignments do not furnish ground for a new trial. The evidence of the Commonwealth's witnesses was clearly sufficient to take the question of whether the statements were made voluntarily to the jury. *Commonwealth v. Lockard,* 325 Pa. 56, conclusively settles this. The mere fact that a confession is made in a police barracks after questioning does not make the statement involuntary: *Commonwealth v. James,* 294 Pa. 156; *Commonwealth v. Cavalier,* 284 Pa. 311.

Assignments thirty-four, thirty-five and thirty-six assign the refusal of the motions made for withdrawal of a juror because of remarks contained in the Commonwealth's closing address to the jury. These statements were at most merely arguments from matters in evidence and were not such as would inflame the minds of the jury against defendant. We are satisfied they had no such effect. It is permissible for a prosecuting attorney to urge upon the jury inferences which can reasonably be drawn from the evidence: *Commonwealth v. Hadok,* supra. The trial court immediately upon refusing the motion, instructed the jury that they were to consider and decide the case solely on the law and the evidence; that the prosecuting attorney should so confine his remarks; and that it believed he was doing so. We have examined the incidents, as reported in defendant's brief, and find no ground for complaint. The action of the court was proper, the argument of the district attorney was confined to the record, and was not of a character to prejudice the defendant.

There remains only assignment thirty-seven, charging error in the refusal to grant a new trial on the ground of after-discovered evidence. The evidence in question was to the effect that a defense witness had been told by a state trooper that examination of the pocket knife by the Commonwealth's pathologist had disclosed the absence of human blood thereon. At most, this could have had no other effect than to contradict the testimony

of the pathologist who testified that human blood was on the knife. After-discovered evidence offered only to impeach the credibility of witnesses who testified at the trial does not constitute sufficient ground for granting a new trial: *Commonwealth v. Elliott,* 292 Pa. 16; *Commonwealth v. Carter,* 272 Pa. 551; *Commonwealth v. Flanagan,* 7 W. & S. 415. Moreover, the testimony taken on this motion clearly showed that the statement of the trooper was the result of a poor telephone connection which led the district attorney to misunderstand the report of the pathologist. That this was so was clearly proven by the latter's official report dated the day of the telephone conversation, which stated the pocket knife was stained with human blood. If this testimony had been presented at the original trial, it does not appear it would have helped defendant, or would have altered the verdict. It does not therefore justify reversal: *Commonwealth v. De Felippis,* 245 Pa. 612. In addition, if this testimony had been offered at this trial, and objected to as it was when given on the motion for a new trial, it would have been the duty of the court to exclude it as pure hearsay. Therefore it could not have reached the jury, affected the verdict or benefited defendant.

The remaining assignments, thirty-eight, thirty-nine, and forty, are merely formal and are disposed of by what has been said concerning the other assignments.

We have carefully reviewed both the law and the evidence, as it is our duty to do, and have found all the essentials of first degree murder. The defendant had a fair trial, his counsel did the best possible for him, and the conduct of the entire trial was calm and judicial. The verdict was the natural result of overwhelming evidence, the most damaging part of which resulted from defendant's own testimony and confessions, which, together with the strong circumstantial evidence, completely engulfed him.

All the assignments of error are overruled, the judgment is affirmed and the record remitted to the court below for the purpose of execution.