Commonwealth *v.* Holden, Appellant.

Argued May 28, 1957.   Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Philip H. Scheiding,* with him *Regis S. Manion,* for appellant.

*William Claney Smith,* Assistant District Attorney, with him *Edward C. Boyle,* District Attorney, and *George H. Ross,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, October 7, 1957:

The jury found defendant guilty of murder in the first degree, with sentence of life imprisonment. The principal question raised in this case is whether the evidence of identity of defendant was sufficient to sustain a conviction of murder.

Between 6:00 and 6:30 a.m. on the morning of December 31, 1955, Cora Smith was severely beaten on the head, her skull was fractured and she was robbed in her speakeasy home in the City of Pittsburgh. She died the following day from the blows inflicted on her head. Defendant denied he was in Cora Smith's house at any time during the night or morning in question, and denied that he killed Cora Smith or struck Alfred Carter and Alfred Smith. Defendant had no corroboration of where he was between 5:00 and 6:30 a.m. on December 31, 1955. Two Commonwealth witnesses who had been drinking a considerable amount of liquor positively identified defendant as having been in Cora Smith's room at the time she was killed and iden-

tified defendant positively as the man who brutally beat them at that time.

The rule concerning identification testimony has been recently stated by this Court in *Commonwealth v. Kloiber*, 378 Pa. 412, 424, 106 A. 2d 820:

"Where the opportunity for positive identification is good and the witness is positive in his identification and his identification is not weakened by prior failure to identify, but remains, even after cross-examination, positive and unqualified, the testimony as to identification need not be received with caution—indeed the cases say that 'his [positive] testimony as to identity may be treated as the statement of a fact': Commonwealth v. Ricci, 161 Pa. Superior Ct. 193, 195, 54 A. 2d 51; Commonwealth v. Sharpe, 138 Pa. Superior Ct. 156, 159, 10 A. 2d 120. For example, a positive unqualified identification of defendant by one witness is sufficient for conviction even though half a dozen witnesses testify to an alibi: Commonwealth v. Pride, 143 Pa. Superior Ct. 165, 167, 18 A. 2d 879; Commonwealth v. Saldutte, 136 Pa. Superior Ct. 52, 56, 7 A. 2d 121; Commonwealth v. Ricci, 161 Pa. Superior Ct., supra; Commonwealth v. Tracey, 130 Pa. Superior Ct. 15, 196 A. 549; Commonwealth v. Lindner, 133 Pa. Superior Ct. 196, 2 A. 2d 518; Commonwealth v. Sharpe, 138 Pa. Superior Ct., supra."

Alfred Carter and Cora Smith, the deceased, were sitting in the room where the murder took place around 5:30 a.m. on December 31. Alfred Smith, Cora's son (age 33) then came into the room. Smith testified that between 1:00 a.m. and 5:00 a.m. he had had two beers and a couple of drinks. He then went to his mother's home to spend the night. He asked her for a drink but his mother refused to give it to him and told him to go to sleep on the couch. Alfred Car-

ter was the only other person in the room at that time. Smith fell asleep. When he awoke Alfred Carter was sitting on a chair, bent over with his head bleeding and defendant "was going down my mother's bosom where she kept the money, down in her breast". *He positively identified the defendant.* When Smith got up from the couch, defendant picked up a stick and started beating him. *His mother at that time was unconscious.* Defendant beat Smith into unconsciousness. Smith testified that he got "a close look" and "a good look" at defendant's face and repeated that he was positive that the man who did this was the defendant. When he regained consciousness, the $10 he possessed had been removed from his pocket. When Smith was at the hospital to which he had been taken, he was shown five or six or ten pictures of colored men. He immediately picked out the picture of defendant and said that was the man. The next night the police brought the defendant to the hospital. The only available light was a flashlight and Smith told police to bring him back the next day when the light was good. The police returned with defendant the next day at which time Smith positively identified him as the man who beat him in his mother's home.

Alfred Carter was in the speakeasy at the time of the various beatings. He corroborated Alfred Smith about his coming to his mother's home and going to sleep on the sofa. Carter was sitting there talking with Cora Smith when a man who had come in and was sitting over in the corner said: "You people get the hell out of here". Carter stood up when he saw the man coming at him since he wanted to get out of the place. He was struck over the head three times before his head was fractured and he was knocked unconscious. He testified that *he got a good look at the*

*man twice and he recognized him when he saw him as
well as recognied him when he saw his picture,* although he had never seen the man before.

Defendant contends that the identification was not clear or positive because of the following testimony of Carter, who like the other witnesses was uneducated.

"A. I told him I recognized him and saw him on the picture. I had never seen the man before. If it wasn't Mutt Holden, he got a second that just looks like him. If it wasn't Mutt Holden, he has a second. Q. If it wasn't Mutt Holden, he has a second? A. Yes, and there is the picture I identified in the hospital. Q. That is the one you identified in the hospital, Exhibit 22? A. Yes, and I seen him first when I tried to put the left hand up. Q. Did you get a good look at the man that hit you? A. I got a look and I didn't see him before. Q. How many times were you hit, Alfred? A. Right over here, right over there and a fracture right there. Q. What hapened when you were hit, what did you do? A. I tried to get to the door and the next time I was just out and that is all."*

When defendant was taken to the hospital where Carter was confined for 17 days, Carter could not see or identify defendant because his eyes were bandaged. However, he identified him at the Coroner's inquest.

Defendant, we repeat, denied any connection with the assaults and denied that he was in Cora Smith's house or room at the time of the murder and testified

---

* When Carter was in the hospital the next day he noticed that the two $5 bills which he had had in his pocket were gone. He had had a lot to drink that night. He had had a couple of double "shots" at home; then he went to a place called Tony's where he had a couple of "shots" "but it didn't amount to nothing". Then he went home, and then he came to Cora's place and had a drink there.

he was elsewhere. Smith and Carter were in a position to identify defendant; the identification was positive and was amply sufficient to identify defendant as their assailant. The Court's charge on identification was more favorable to defendant than the law required. We find no merit in this contention.

Defendant contends that the failure of the Commonwealth to produce the blood-stained clothing worn by defendant at the time of his arrest* constituted fundamental error. Counsel for defendant vigorously argued to the jury that they could infer from the Commonwealth's failure to introduce into evidence defendant's blood-stained clothing was because it would have been unfavorable to the Commonwealth. This is not a case where the Commonwealth suppressed the evidence; on the contrary, the introduction of defendant's blood-stained clothing would have made out a stronger case against the defendant, and consequently its omission was harmless error.

Defendant also complains that the trial Judge committed reversible error in failing to call *sufficiently* to the jury's attention the testimony most favorable to defendant, i.e., the intoxication of Commonwealth's witnesses. The trial Judge affirmed defendant's point for charge on the subject of intoxication which pointed out the doubt that would naturally arise as to identification, and counsel did not ask for any further charge on this point. At the conclusion of the Court's charge to the jury, defendant's counsel was asked whether there was any additional request for charge and no request for pertinent additional charge was made by defendant.

---

* The Commonwealth failed to prove but subsequently stated that the laboratory technician was unable to testify because he was in California.

In *Commonwealth v. Barnak,* 357 Pa. 391, 54 A. 2d 865, the Court, quoting from *Commonwealth v. Mendola,* 294 Pa. 353, 359, 144 A. 292, said (page 420): "'. . . "Where counsel for defendant fails to ask further and fuller instructions or for corrections in the charge, although opportunity is given him, he cannot, on appeal, complain of error in the statement of facts by the trial judge either on the ground of inaccuracy or insufficiency:" [Citing cases].'" See to the same effect *Commonwealth v. Becker,* 326 Pa. 105, 112, 191 A. 351; *Commonwealth v. Bruno,* 316 Pa. 394, 175 A. 518; *Commonwealth v. Winter,* 289 Pa. 284, 297, 137 A. 261; *Commonwealth v. Bryson,* 276 Pa. 566, 120 A. 552.

We have read the charge of the Court and considering it, as we always must, in its entirety, it left fairly to the jury all the issues of fact and contained no reversible error: *Commonwealth v. Kloiber,* 378 Pa., supra (page 418); *Commonwealth v. Donough,* 377 Pa. 46, 53, 103 A. 2d 694; *Commonwealth v. Barnak,* 357 Pa., supra (page 406).

We find no merit in any contentions of the defendant.

Judgment and sentence affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The Majority Opinion fails to discuss a very important matter raised by the defendant Charles Holden in his appeal to this Court for a new trial.

On December 31, 1955, between 5:15 and 6:40 a.m., Cora Smith was killed in her home as the result of being struck over the head. The defendant, Charles Holden, was accused, tried, and convicted of her mur-

der. He maintained in his defense that he was innocent, since he was not in the victim's home at the time of the brutal attack.

At the time of Holden's arrest, he was taken by the police to the home of a Ralph Jones who had been with Holden for several hours prior to the killing. In Holden's presence, Jones was questioned by the police. The matter of this questioning became a subject for inquiry at the later trial. The assistant district attorney representing the Commonwealth asked Jones if, at the time he was being quizzed by the police in Holden's presence, Holden did anything that was unusual. Jones replied: "Well, during the period of time that the detectives were questioning me in his presence, I believe one of them noticed him to sort of wink or something." The assistant district attorney then asked Jones what Holden meant, and Jones replied: "I didn't rightfully know whether it was a wink or something that was in his eye."

The prosecuting attorney's question was a flagrant violation of the rules of evidence and should not have been permitted. What Jones may have thought that Holden meant by the wink, if it was a wink, was entirely speculative. The prosecuting attorney might just as well have asked: "What was Holden thinking of at the time?" In fact, the question imported that very type of query because obviously the eye, no matter how eloquent it is supposed to be in the minds of poets, novelists, and dreamers, is still not capable, by a blink, to telegraph complicated messages, unless, of course, the blinker and the blinkee have previously agreed upon a code.

When Jones replied that he did not know whether Holden had actually winked or had been troubled by a foreign substance in his eye, the Commonwealth's

attorney asked him about a statement he had made to the police some time following the winking incident. On January 11th, a few days after the blinking affair, Captain Flynn of the City Detective Bureau asked Jones: "What did you take this wink to be?" and Jones replied: "I think he was trying to get me to make an alibi for him to cover up some of his actions and I don't know nothing about any of his actions."

Commonwealth's counsel sought to introduce this statement at the trial and defense counsel properly objected, explaining: "We object to that. Whatever it was, it wasn't made in the presence of the defendant, Charles Holden." The objection was overruled and the jury was thus informed that the defendant endeavored to have Jones frame an alibi for him. On what evidence was this information based? A wink.

And what did the wink say? I repeat: "I think he was trying to get me to make an alibi for him to cover up some of his actions and I don't know nothing about any of his actions."

It will be noted that the stupendous and compendious wink not only solicited the fabrication of a spurious alibi but specified that it was "to cover up some of his actions." One movement of the eyelid conveyed a message of 21 words. Not even the most abbreviated Morse code could say so much with such little expenditure of muscular and mechanical power.

Although the statement of the interpretation of the wink is preposterous on its face, I can see how it could be made to seem very informative and convincing to the jury, since it was given to the jury with the Court's approval. If Holden had actually spoken to Jones the words which Jones related in his interpretation of the wink, no more effective admission of guilty knowledge could be imagined. Jones and Holden had been to-

gether prior to the killing. Holden tells Jones to make up an alibi so that Jones can extend their companionship of the evening to an hour including and beyond the time of the killing. And then Jones not only refuses to do what Holden asks him to do, but relates the criminal attempt on the part of Holden to suborn perjury.

But the fact of the matter is that Holden did not ask Jones to fabricate an alibi. He did not ask him to "cover up some of his actions." All that Holden did was to wink. No one knows whether he was trying to convey a message, whether he was attempting to shut out a strong ray of light, or whether a bit of dust troubled him at the moment. The Court, however, allowed the jury to believe that the wink was a semaphoric signal to Jones to commit perjury.

Was ever more ridiculous evidence presented in a murder trial? What is to happen to our rules of evidence in criminal trials if they can be breached so glaringly, without reproof or criticism by this Court? Holden was convicted and sentenced to life imprisonment. He might have been sentenced to death. On a wink.

And the Majority does not consider the matter of sufficient importance even to mention it.

If a witness is to be allowed to state what he believes a wink said, why should he not be allowed to interpret a cough? Or a sneeze? Or a grunt? Or a hiccough? Why should he indeed not be empowered to testify as to what is passing through an accused's brain? Why not permit mind readers to read a defendant's mind, and thus eliminate the jury system completely because who knows better than the defendant himself whether or not he committed the crime of which he stands accused?

The refusal of this Court to grant a new trial, with so momentous a violation of the defendant's rights, duly noted and excepted to on the record, would suggest that here the law has not only winked but closed both eyes!