**Tyrus Fields JONES and Robert Wesley Princeler, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 7711.**

United States Court of Appeals Fourth Circuit.

Argued Nov. 3, 1958.

Decided Dec. 11, 1958.

Walter E. Black, Jr., and H. B. Mutter, Baltimore, Md. (Court-appointed counsel), for appellants.

John R. Hargrove and Martin A. Ferris, Asst. U. S. Attys., Baltimore, Md. (Leon H. A. Pierson, U. S. Atty., Baltimore, Md., on the brief), for appellee.

Before SOBELOFF, Chief Judge, and SOPER and HAYNSWORTH, Circuit Judges.

SOBELOFF, Chief Judge.

The appellants were convicted by a jury and sentences of twenty-five years were imposed upon each of them under an indictment for bank robbery in violation of Title 18 U.S.C.A. §§ 2 and 2113. Since a principal contention on this appeal is that the evidence is legally insufficient to sustain the conviction, a somewhat detailed summary is necessary.

Clarence E. Cranford, an employee of the First National Bank of Southern Maryland, Marlow Heights Branch, was at home with his wife and child on the night of January 26, 1958, when two armed men entered the apartment at 10:25 p. m. and announced to Cranford that he was going to take them to the bank to get the money from the night depository, and that if he did as he was told no one would get hurt. The men wore masks, described by Cranford as the "Frankenstein type," covered with painted scars, gashes and horns, and it was brought out in the testimony that one of the masks appeared to have more red coloring than the other. One man was carrying a sawed-off shotgun; the other, a pistol. Further to impress their victims, the bandits broke open the weapons and showed them that the ammunition chambers were loaded. Afforded this unusual opportunity for a close inspection, the Cranfords noted certain distinctive features of the sawed-off shotgun, particularly the ridges or jagged

marks made by the saw in cutting away the barrels.

Some conversation ensued, but as the man and wife were required to face the wall, they had "very little chance to observe" the men at that time. Cranford did testify, however, that when he was taken to his bedroom to get a pair of socks, he had a good look, through the opening in the mask, at the eyes and "rather sandy eyebrows" of the man later identified as Princeler. Though the other facial features were covered, Cranford testified that he clearly observed the eyes and part of the eyebrows.

The men switched guns, and the one then carrying the pistol left with Cranford. As directed, Cranford drove off with the man in his, Cranford's, car to the bank, opened the bank door, and placed all the cash and checks from the night depository into a bag. Cranford was then instructed to telephone his wife. The masked man took the phone and talked briefly to the accomplice he had left in the Cranford apartment. He tied Cranford's hands and feet, left him at the bank and departed with the loot about 11:00 p. m.

Meanwhile, the other masked man had remained, shotgun in hand, with the woman and child. She testified that while there was little conversation, he did order her to get him a soft drink from the refrigerator. She specially noted the quality of his voice. When the telephone rang and Mrs. Cranford answered, the man took the phone from her, talked briefly, hung up and hastily withdrew from the apartment. The woman further testified that she had observed that the man wore dull black loafers, blue trousers and argyle socks. She also noticed rather closely his hair and neck when he was talking on the telephone.

Four days after the robbery, the Cranfords attended two line-ups conducted by the FBI in Hyattsville, Maryland. The first consisted of five FBI agents and the appellant Princeler. At the trial an FBI agent estimated the height of the men in the line-up as ranging from 5'-10" to 6'-2". Princeler is 6' tall. Mrs. Cranford positively identified Princeler as the masked man who stayed in the apartment with her, because "his hair was the same color and looked the same as the man that was in the apartment with me, and when he spoke [in the line-up] I just knew it was him." On cross-examination, she admitted that there was nothing peculiar about his build, hair color, or "soft-spoken voice," but she adhered firmly to her identification of Princeler. Her husband, on the other hand, could not make a positive identification of Princeler and would testify only that he "resembled" one of the masked men. Certain discrepancies in the description Cranford gave the police of the man who remained in the apartment further weakened his testimony as to Princeler.

Included in the second line-up were the appellant Jones, two FBI agents and two civilians. Cranford was more sure in his identification of Jones as the masked man who took him to the bank. The wife also identified Jones. The Cranfords testified at the trial that after witnessing the line-ups they had no discussion with each other before they identified both the accused.

The line-up procedure seems to have been normal. The contention that those who stood up with the defendants were distinctly different and "cleaner" in appearance, to facilitate and induce identification of the defendants, raises a jury question. Our examination of the photographs of the line-ups indicates no basis for the contention.

A search of Princeler's apartment yielded a pair of black loafer shoes, which Mrs. Cranford identified as "looking exactly" like those worn by the masked man who stood guard over her in the apartment.

It was stipulated at the trial that the appellant Jones was visited by his brothers, Donald and Charles, at the Baltimore City Jail on the morning of February 12, 1958. One Lazzari, called as a witness for the Government, testified that at 1:00 p. m. on that very day, while driving across the 11th Street Bridge in Wash-

ington, D. C., he saw Donald Jones drop something off the bridge into the water. This was denied by Donald Jones, when called as a defense witness, but Lazzari insisted that he knew Donald because they grew up in the same neighborhood. Lazzari promptly pointed out the location on the bridge to an FBI agent, who had a diver search the river under the bridge. The barrel of a shotgun was found in the water.

In a wooded area approximately 200 yards from the home of the parents of the appellant Jones were found two masks, a sawed-off shotgun and a pistol. Both Cranfords identified the shotgun and the masks as looking like those used by the masked men who invaded their home on the night of the robbery. One mask had somewhat more red on it than the other. An FBI laboratory test established that the shotgun barrel recovered from the river was once joined to this sawed-off shotgun.

The appellant Jones' brother, Donald, on cross-examination, admitted not only that he knew Princeler but that they had been involved in a criminal charge together. Several witnesses for the defense, friends and relatives, offered alibis for the accused on the night of the robbery, which the Government sought to overcome by countervailing testimony.

▪ Both appellants objected to all evidence relating to the shotgun barrel, contending that it was too speculative to connect them in any way with the commission of the crime charged. Specifically, their objection was aimed at the testimony offered to show that Donald Jones, several hours after visiting his brother in the Baltimore City Jail, had attempted to dispose of the shotgun barrel formerly attached to the sawed-off shotgun identified as that used by the masked men. Indisputably, this evidence tended to implicate the appellant Jones, for it directly traced to him the severed part of the weapon shown to have been used in the commission of the crime.

▪ It is earnestly contended, however, that the gun barrel had no place in the case so far as Princeler is concerned.

The argument seems to be that it was without any probative value, and that the Court erred in admitting this piece of evidence, thereby permitting it to be used by the jury as corroborative of the Cranfords' testimony identifying Princeler. The fallacy of the objection is in its premise as to the reason for the admission of the gun barrel. There was testimony from the husband and wife identifying the sawed-off shotgun. When the Government produced the gun barrel which exactly fitted the weapon already linked to each of the men, the proffered evidence was properly received. It was inevitably a part of the story. The gun barrel is not an item unrelated to the case, something dragged in to inflame the jury against either defendant. See Underhill's Criminal Evidence, 5th Ed., Sec. 634, pp. 1509–10, and Carr v. State, 1957, 95 Ga.App. 513, 98 S.E.2d 231. It is as pertinent a piece of evidence as the masks, the sawed-off shotgun, or any other detail of the crime. Even if a fact, standing alone, does not conclusively demonstrate guilt, a defendant is not entitled to have it filtered out of the evidence. An effort to blinker out all circumstantial color and tone would result only in distortion.

The argument pressed here is really not one of relevance, but of the weight to which the barrel was entitled as to Jones and as to Princeler. The point was strongly debated from the standpoint of each by the respective defense attorneys. The evidence was fairly admitted and properly treated as presenting a jury question.

▪ If the identification of Princeler depended solely on Mr. Cranford's testimony, we might agree with his counsel that it was too uncertain to raise a jury question, and the gun barrel would not supply the deficiency. However, Mrs. Cranford's confident identification of him, and the testimony about his shoes, were clearly sufficient to take the case to the jury as to him, and, as we have seen, there was much to fortify this *prima facie* case. Commonwealth v. Holden, 1957, 390 Pa. 221, 134 A.2d 868;

**48**

Davis v. United States, 10 Cir., 1935, 78 F.2d 501.

 Another contention which the appellants press is that their legal defense was conducted in such an incompetent manner as to deprive them of due process of law. Selected and employed by the appellants, themselves, the men who conducted the defense are reputable members of the bar, skillful and exceptionally experienced in the trial of criminal cases. Each has in the past served as Assistant State's Attorney for Baltimore City, and each has engaged extensively in defending criminal cases in the state and federal courts, including many cases of importance. Cross-examination of Government witnesses was vigorous and thorough, timely objections to evidence were interposed, and such defense testimony as was available was completely presented.

A perfect trial, from the standpoint of the prosecution or of the defense, is as rare as the perfect crime. With the benefit of hindsight it is always possible to suggest that certain questions might have been framed differently, or that other tactics might have proved more successful. An adverse result is a powerful stimulant to the imagination, but "second-guessing" is not enough to entitle a defendant to a new trial if he has had one that was essentially fair. We perceive in this record no incompetence or other reason to criticize either of the defense counsel, and nothing whatever to give support or color to the claim that the judge's charge was "biased and prejudicial." Our examination of the charge and the record on which it was based convinces us of its impartiality and fairness.

Equally without justification, we may add, is Jones' disavowal of the two lawyers we appointed to assist him and his co-defendant in this court. One is the former Acting United States Attorney for the District of Maryland; the other, though younger, is a lawyer of diligence and ability. Both worked with zeal in the preparation of the brief and in presenting the argument on appeal.

 We conclude that there was sufficient evidence against each appellant to warrant the jury's finding of guilt beyond a reasonable doubt. There was no error in the admission of testimony, and no unfairness in the conduct of the trial. Affirmed.