UNITED STATES of America, Appellee,

v.

Lawrence CUNNINGHAM, Appellant.

UNITED STATES of America, Appellee,

v.

Richard DEWS, Jr., Appellant.

Nos. 13355, 13384.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 6, 1970.

Decided April 9, 1970.

Archie D. Williams, Baltimore, Md. (court-appointed counsel), for Lawrence Cunningham.

Norman N. Yankellow, Baltimore, Md. (court-appointed counsel), for Richard Dews, Jr.

Paul M. Rosenberg, Asst. U. S. Atty. (Stephen H. Sachs, U. S. Atty., on brief), for appellee.

Before BOREMAN, WINTER and CRAVEN, Circuit Judges.

WINTER, Circuit Judge:

Convicted of various degrees of bank robbery, including armed bank robbery, and the interstate transportation of a stolen motor vehicle, for which they received concurrent sentences aggregating twenty years, defendants, Lawrence Cunningham and Richard Dews, Jr., appeal. They claim that their constitutional rights were violated by their pre-custody identification and their post-custody identification by corporeal lineup. They claim error also in the admission of a gun into evidence at their trial, in the remarks of the district judge during trial and in his charge, and in the presence of the F.B.I. agent in charge of the case at the trial table during the proceedings.[1] Finding no violation of constitutional rights or reversible error, we affirm.

I

The robbery of Central National Bank of Maryland, Riggs Plaza Branch, Hyattsville, Maryland, for which defendants were convicted, occurred on January 5, 1968. Four robbers obtained a sum in excess of $3,000.00 at the point of a gun. Several bank employees and several customers saw the robbers, whose faces were either masked or partially covered by handkerchiefs. The robbers made their getaway in a stolen Chevrolet automobile. They abandoned the stolen vehicle in Washington, D. C., where, within sight of two eleven-year-old boys, they split up and left in two other vehicles.

Defendants were not apprehended until March 11, 1968. On several occasions prior to their arrest, the persons who witnessed the robbery were shown numerous photographs. Some of the witnesses identified the photographs of defendants and other codefendants as persons who committed the robbery.

On March 19, 1968, after their arrest and immediately prior to a preliminary hearing, defendants participated in two corporeal lineups in Washington, D. C. Cunningham and a codefendant participated in the "upstairs" lineup, and Dews and another codefendant participated in the "downstairs" lineup. Defendants were viewed by the witnesses to the crime, and some identified them as participants. Counsel were present when the suspects were exhibited to the witnesses. Counsel were present also when the witnesses were questioned, except, that as a result of an argument, counsel for Cunningham was not present when one witness, who subsequently identified Cunningham at trial, stated that he identified him in the lineup.

At trial various witnesses were permitted to testify that they could identify defendants in court, that they had identified defendants from photographs, that they had identified defendants at the lineups, and that they had identified defendants at the preliminary hearing.

We will state additional facts in connection with the consideration of the contentions to which they relate.

II

The pre-custody exhibition of photographs occurred on January 29, 1968, when they were shown to six of the ten witnesses to the robbery, and on January 31, 1968, when they were shown to a seventh witness who had not seen them two days earlier. On these occasions fourteen photographs were shown: (a) four color photographs and one

---

1. Two other contentions which we find utterly lacking in merit need not be discussed.

black and white photograph of Dews, (b) two color photographs and one black and white photograph of Paul DeBruhl, a codefendant, (c) one color photograph and one black and white photograph of Cunningham, and (d) four black and white photographs of different individuals not having any connection with this trial. A group of twelve other photographs were exhibited to these witnesses on February 26 and 27, 1968, but no picture of Dews or Cunningham was included.

From our analysis of the record, it appears that of the seven who saw the photographs only three identified Dews, one of whom was uncertain of his identification. Four identified Cunningham. The witness making an uncertain photographic identification did not identify Dews at trial. The other two did identify him at trial, relying in part upon the photographic identification. Of the four who identified Cunningham from the photographs, only three identified him at trial. Of these only one testified to any reliance on the photographs. Thus, two witnesses who identified Dews at trial and one who identified Cunningham at trial admitted that their identifications were based in part upon their having seen photographs prior to the time that either defendant was in custody. Cf. United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967); Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967). Only one person identified both defendants from the photographs.

Simmons v. United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), is the keystone case on pre-custody identification by photographs. There, where the witnesses had seen six photographs of defendant out of a total undisclosed number, the Court refused to outlaw this device either as a matter of constitutional law or under its supervisory power. "Intead, we hold that each case must be considered on its own facts, and that convictions based on eyewitness identification at trial following a pretrial identification by photographs will

be set aside on that ground only if the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." 390 U.S. at 384, 88 S.Ct. at 971. We have had occasion to apply Simmons in United States v. Butler, 405 F.2d 395 (4 Cir. 1968). There we declined to overturn a conviction where witnesses who made in-court identifications had seen thirteen photographs which included two of the defendant, one of which, unlike any other photograph in the set, depicted him in a uniform with lettering on the front.

The test prescribed by Simmons is not easy to apply, because the articulation of the test describes a result but not how the result is reached. In the instant case, like Simmons, the perpetrators of a major crime—armed bank robbery— were at large so that there was clear necessity in the public interest and for the protection of the public that they be apprehended. Resort to photographs was, therefore, justified. No witness was able to give a definitive oral description. Thus, the range of suspects was almost limitless until the investigation by the authorities had progressed to the point that suspicion had devolved upon a definable group.

Defendants claim that the photographs were impermissibly suggestive because there were five out of fourteen of Dews and two out of fourteen of Cunningham, and because the only color photographs were of defendants and a codefendant. Presumably, also, defendants would support their argument by the fact that a greater variety of poses of them was exhibited than of other persons.

Our own examination of the photographs does not lead us to conclude subjectively that they were impermissibly suggestive. Some suggestion is inherent with regard to Dews in the number of photographs of him which were exhibited, but fewer photographs of Cunningham were included in the whole than of a codefendant. However, the number of photographs of Dews was less than the number of photographs of Simmons in

*Simmons,* where the use of photographs was held not proscribed. As to Dews, as well as Cunningham, there was justification for showing more than a single photograph because the fact that the robbers were masked or had their faces partially covered made identification depend on more than specific facial characteristics. It was important, therefore, to exhibit photographs which showed body build, height and complexion.

There is some evidence to indicate the absence of a substantial likelihood of irreparable misidentification: Not all witnesses who saw the photograph made an identification of either defendant. Although Dews' photographs were the most numerous, one witness less identified him than Cunningham. Significantly, one witness who could not identify Cunningham from photographs identified him in person, and another witness who could not identify Dews from photographs identified him in person. If we treat these witnesses as controls, there is strong evidence that the photographs were not impermissibly suggestive. No person who made an in-court identification relied solely on his photographic identification. Two admitted that they relied in part on their photographic identifications, but one, as to Cunningham, disclaimed any reliance on having seen his photographs. All witnesses were subjected to extensive cross-examination.

█ In short, we conclude that the mere number, color and variety of photographs of each defendant shown the witnesses do not, under the circumstances of this case, entitle defendants to relief under *Simmons.*[2]

### III

We consider next post-custody identifications and the contentions with respect thereto.

Cunningham complains of the manner in which the "upstairs" lineup was conducted and the absence of his counsel when a witness was interrogated as to his recollection. This witness identified Cunningham at trial.

The conditions under which the "upstairs" lineup were conducted were less than ideal. It was held on the second floor of the building in which the United States Commissioner's office is located by using a long, rectangular cell block and an anteroom. The two rooms were joined by a barred door. The witnesses to the bank robbery, along with witnesses to other crimes, were assembled in the anteroom, and Cunningham, along with approximately a dozen other Negro males, was brought into the cell block. The men in the lineup then paraded around the cell block and the witnesses observed them passing by the door.

█ Cunningham complains that he and a codefendant were the only persons wearing jail clothes prominently marked "D. C. Jail," that he was the most light-skinned and youngest in the lineup, and that the witnesses heard one of their number make an identification in a low tone which was then loudly repreated by one of counsel present. In most respects the evidence in these regards was sharply disputed. There was evidence that others in the lineup were dressed in jail clothes and that all the jail clothes were unmarked. Witnesses testified that Cunningham did not appear younger or of a lighter complexion than others in the lineup. Although a witness to another crime remarked "That's my boy," there was testimony that this went unheard by the witnesses to the bank robbery standing some distance away. Since the persons being viewed were passing by the viewing area, the witnesses could not determine to whom it referred when the remark was more loudly repeated. The dis-

2. Additional support for our conclusion is found in the evidence that some of the witnesses, when shown photographs, made an immediate identification upon seeing the first picture of a person they recognized. All witnesses denied that any overt suggestion was made to them.

Overall, the proof of guilt, other than identification by witnesses who made a photographic identification, was substantial and persuasive, thus making the danger of conviction resulting from misidentification remote.

trict judge, in denying motions to suppress and to grant mistrials, found that defendants were not prejudiced by the lineup and that the lineup "was perfectly all right." He further found that the remark was "apparently * * * not overheard," but if overheard, it had no effect on the identification by the bank robbery witnesses. We cannot say that his findings were clearly erroneous. Based on those findings, his legal conclusions were correct.

The circumstances surrounding the absence of counsel when a witness, after viewing Cunningham, was interrogated were these: After the lineup the various witnesses were interrogated in the presence of defense counsel as to possible identification. One of the witnesses, James F. Devine, identified a person not suspected of the crime. Counsel for Cunningham insisted upon knowing the name of the person who was misidentified. The Assistant United States Attorney supervising the lineup refused to divulge the name, and an angry discussion followed. Defense counsel were then ejected from the interrogation, and Alan R. Byrd, who later identified Cunningham at trial, picked him from the lineup in the absence of Cunningham's counsel.

Based upon United States v. Wade, *supra*, and Gilbert v. California, *supra*, Cunningham claims that he was denied his right to counsel because Byrd was interrogated in the absence of counsel. We disagree.

■ While *Wade* and *Gilbert* both hold that under the Sixth Amendment an accused is entitled to the aid of counsel at the lineup, we cannot read the scope of the holding to extend beyond the actual confrontation between the accused and the victim or witnesses to a crime from whom identification evidence is sought to be elicited.[3] The rationale of these cases is the potential intentional or unintentional suggestion inherent in the actual confrontation and the difficulty of establishing at trial by objective evidence the circumstances under which the lineup proceeded. Here, the lineup was terminated and witnesses were being interrogated outside of the presence of suspects. Confrontation had occurred and was terminated. By the rationale of *Wade* and *Gilbert*, counsel was no longer required unless we were prepared to hold that defense counsel must be present whenever the government interrogates a witness whose testimony may be used as part of the government's case at trial.

■ The interrogation of witnesses in the investigation of crime or in the preparation for trial is not limited by the rules of evidence or the order of proof, and conscious or unconscious attempts to lead witnesses may occur. We do not think that these dangers are any greater in the case of identification witnesses than witnesses who possess other types of knowledge with regard to the commission of a crime. It is not claimed that to date the Supreme Court has required the presence of counsel during the interrogation of all witnesses, and we will not so require with regard to the interrogation of identification witnesses once the actual confrontation has been completed.

3. In Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), the temporal application of *Wade* and *Gilbert* was considered: "We hold that Wade and Gilbert affect only those cases and all future cases which involve *confrontations* for identification purposes conducted in the absence of counsel after this date." (emphasis supplied) 388 U.S. 296, 87 S.Ct. 1969. *Wade* and *Gilbert* were described later in the opinion: "Wade and Gilbert fashion exclusionary rules to deter law enforcement authorities from *exhibiting* an accused to witnesses before trial for identification purposes without notice to and in the absence of counsel. * * * The Wade and Gilbert rules are aimed at minimizing that possibility [misidentification] by preventing the unfairness at the pretrial confrontation that experience has proved can occur and assuring meaningful examination of the identification witness' testimony at trial" (emphasis supplied) 388 U.S. 297, 87 S.Ct. 1970. We, therefore, read *Wade*, *Gilbert* and *Stovall* to extend only to the period during which an accused is within sight of a potential identification witness.

There is an alternative basis for decision. Alan R. Byrd, when examined at trial, unequivocally stated that his in-court identification was based solely on his observation of Cunningham at the time of the robbery and his memory of Cunningham's facial characteristics. Significantly, Byrd at the time of exhibition of photographs to him, before Cunningham was in custody and later at trial, could identify only one of the two photographs of Cunningham. Byrd also testified on direct examination to his identification of Cunningham at the lineup.

*Wade* and *Gilbert* do not automatically exclude in-court identifications where the identifying witness has participated in a lineup conducted outside the presence of defense counsel. In both cases the relief granted was the opportunity to establish that the in-court identification was not based even in part upon the illegal lineup.

■ Even if we assume that under *Wade* and *Gilbert* the absence of Cunningham's counsel was constitutional error, in-court identification was admissible because the record shows that it was untainted by the lineup.

■ Furthermore, assuming that the admission of Byrd's testimony as to his lineup identification was constitutional error, we are confident the error was harmless. *Gilbert* itself recognized the possibility of harmless constitutional error in the admission of lineup testimony. 388 U.S. 263, 274, 87 S.Ct. 1951, 18 L.Ed. 2d 1178. The test for harmlessness is whether the appellate court is "able to declare a belief that it was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967). Applying that standard to the instant case, we have no doubt that the error was harmless to Cunningham.

Cunningham was convicted on substantial circumstantial evidence which corroborated the numerous eyewitness identifications. He was shown to be the owner of one of the automobiles used in the robbery. The government proved an association with codefendants whose involvement is not now contested. Three witnesses other than Byrd identified Cunningham at trial. There was testimony elicited about prior identification by these three witnesses. Most important, Byrd made his in-court identification independently of having seen Cunningham in the lineup. The in-court identification minimized the impact of the prior lineup identification. Viewing Byrd's lineup testimony in respect to his other testimony and in respect to the other incriminating evidence, we have no reasonable doubt that the constitutional error, if any, was harmless.

■ Finally, with respect to post-custody identifications, Dews complains of the exhibition of photographs to the witness Milton London, as London was arriving for his view of the lineup. London was late in arriving because of a misunderstanding as to the date on which the lineup would be conducted. He was sent for as the lineup was about to begin and, when he arrived at the building, he was met by an F.B.I. agent, who escorted him to the lineup. While walking to the lineup the agent inexplicably showed him a packet of photographs. The photographs, which the district judge found were shown to London, were made part of the record in proceedings out of the presence of the jury. Our examination of them establishes that no photograph of either Cunningham or Dews was included. Thus, factually, we do not have the issue which divided us in United States v. Marson, 408 F.2d 644 (4 Cir. 1968), and United States v. Collins, 416 F.2d 696 (4 Cir. 1969). Dews cannot complain when no photograph of him was shown to London after Dews was taken into custody.

### IV

Admitted into evidence at the trial of Dews and Cunningham was a gun which had been recovered from the apartment of Paul DeBruhl, a codefendant, as to whom a severance was granted. Several witnesses at trial identified DeBruhl as one of the robbers and the gun as simi-

lar to one used during the robbery. Because there was no testimony to establish that either Dews or Cunningham used a weapon or that the gun admitted was the gun used in the robbery, Dews and Cunningham claim that reversible error was committed.

 We disagree. Dews and Cunningham went to trial on a charge, *inter alia*, of armed bank robbery. They were indicted both as principals and as aiders and abettors under 18 U.S.C.A. § 2. They could be found guilty even if they themselves did not brandish a weapon so as to intimidate or assault bank employees or customers. The lack of positive testimony to identify the gun as the gun used in the robbery does not preclude its admissibility. There was ample testimony of the fact that a weapon was used in the commission of the crime and there was ample evidence of the similarity between the gun admitted and the gun which was used. The testimony as to similarity warranted admission. Yates v. United States, 362 F.2d 578 (10 Cir. 1966); Johnston v. United States, 260 F.2d 345 (10 Cir. 1958), cert. den., 360 U.S. 935, 80 S.Ct. 1454, 4 L.Ed.2d 1547 (1959). With testimony of similarity, the testimony of the use of a gun in the perpetration of the crime also warranted its receipt into evidence because a gun was part and parcel of the entire story. In another gun case, we had occasion to say "Even if a fact, standing alone, does not conclusively demonstrate guilt, a defendant is not entitled to have it filtered out of the evidence. An effort to blinker out all circumstantial color and tone would result only in distortion." Jones v. United States, 262 F.2d 44, 47 (4 Cir. 1958), cert. den., 359 U.S. 971, 79 S.Ct. 886, 3 L.Ed.2d 838 (1959).

### V

Defendants claim reversible error in the district judge's remarks made in the course of interrogation of Alan R. Byrd about his ability to identify a codefendant. During cross-examination, Byrd was interrogated about his testimony at the preliminary hearing. When examined on the same subject by the government on redirect, the district judge noted that the witness had said the same thing three or four times. During the discussion that ensued, the district judge stated "You people have talked and discussed it back and forth, and he has answered, and as far as I can see, he is conscientiously trying to tell you what he saw and what he didn't see, and what he did and what he didn't do." This remark was made in the presence of the jury.

Counsel for defendants immediately moved for a mistrial on the ground that the district judge's use of the word "conscientiously" implied to the jury that the district judge thought the witness was telling the truth. The mistrial was denied, but the district judge offered to give the jury a special instruction that they were the sole judges of the credibility of the witnesses. Counsel for defendants declined the instruction at that time because of their fear that it might highlight the incident in the eyes of the jury. However, elsewhere during the trial and specifically in the charge, the jury was told unequivocally that they were the sole judges of the credibility of the witnesses. Indeed, the jury was told to disregard entirely any comments that the district judge may have made concerning the evidence since the jury was the sole judge of the facts.

 Any unfairness in this isolated comment, in the course of a trial lasting several days, was not of such magnitude or so pervaded the fairness of the trial that defendants suffered prejudice. Smith v. United States, 305 F.2d 197 (9 Cir. 1962), cert. den., 371 U.S. 890, 83 S.Ct. 189, 9 L.Ed.2d 124 (1962). The district judge's general charge was sufficient to cure any error which had occurred.

 Another slip occurred during the charge, but it, viewed in context, did not constitute reversible error. In the course of summarizing some of his previous instructions the district judge remarked "as I've already told you, there are four separate counts in this case, and

as I told you before you must find the Defendant guilty as to each count, each Defendant separately." The phrase "you must find the Defendant guilty as to each count," standing alone, would be an improper instruction to return a guilty verdict, but the comment came only after the district judge had instructed the jury (a) that they should consider his instructions as a whole, (b) that the defendants were presumed innocent, (c) that the burden was upon the government to prove guilt beyond a reasonable doubt, (d) that the government's burden included proving identity of the defendants as the perpetrators of the crime beyond a reasonable doubt, (e) that the government must prove all of the elements of the crimes charged beyond a reasonable doubt, (f) that the jurors were to commence their deliberations under the presumption of innocence which persisted until the jury was convinced that the government had sustained its burden of proof, (g) that the jury was to consider all the evidence in the case in determining whether each defendant had been proven guilty, and (h) that the government's burden of proof extended to each count of the indictment and to each of the defendants separately. The jury could not have been misled by the district judge's single inadvertence.

### VI

■ The F.B.I. agent in charge of the case sat at the trial table during the proceedings on the motion to suppress evidence and at the trial, although other witnesses were sequestered. He was present during the hearing on the motion at the request of the government and pursuant to an agreement that he would be called to testify first. The agent was called by the defendants as their first witness. He was called by the government only on rebuttal to testify briefly about a specific incident touched on by Cunningham in his testimony. At the trial the agent was called principally as a rebuttal witness and, again, his testimony was relatively brief and dealt with specific incidents proved by the defend-

ants in connection with the "upstairs" lineup.

Under the circumstances which we have described, the presence of the agent was in full accord with the holding and spirit of our decisions in United States v. Missler, 414 F.2d 1293 (4 Cir. 1969), and United States v. Harris, 409 F.2d 77 (4 Cir. 1969). We note also that the district judge offered to instruct the jury that it should not give any greater weight to the testimony of the agent than any other witness and should judge the credibility of the agent the same as any other witness. Defense counsel, however, declined the instruction.

There was no denial of constitutional rights or reversible error. The judgments are

Affirmed.